STATE of Missouri, Respondent,

v.

Leo W. BALLARD, Appellant.

No. KCD 28858.

Missouri Court of Appeals,
Kansas City District.

May 31, 1977.

Motion for Rehearing and/or Transfer
Denied June 27, 1977.

Application to Transfer Denied
Sept. 12, 1977.

Joe Hamilton Scott, Public Defender, St. Joseph, for appellant.

John D. Ashcroft, Atty. Gen., Bruce E. Anderson, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P. J., and WASSERSTROM and TURNAGE, JJ.

WASSERSTROM, Judge.

Defendant appeals from conviction by jury of burglary in the first degree, under Count I of the information, and of felonious assault with malice aforethought, under Count II of the information. Applying the second offender act, the trial court assessed the punishment which it fixed at ten years imprisonment on the burglary and thirty-five years on the assault.

The events in question occurred at the home of Gary and Mary Huffman on the night of August 6, 1975. The house had a ground level containing bedrooms and other living quarters and a lower level consisting of basement, recreation room and garage. The upstairs portion had a front door and a back door. In the early evening hours of August 6, the front door was closed and locked and the back door was closed but unlocked. The lower level had but one door, and at all times until at least 11:00 p. m., that door was both closed and locked. The windows were all closed.

About 8:00 p. m. that evening, Mary went out to a convenience store approximately 1 mile distant from the house. She did not return until sometime between 11:00 and 11:30 p. m., entering from the rear door on the ground level. During the time she was gone, Gary watched television in the recreation room. When Mary returned, she remained upstairs for a few minutes and then joined Gary downstairs. He asked her what took her so long, but she did not answer the question. He wanted to stay up and finish watching a movie, but she turned off the television set and took him by the hand and led him to the bedroom upstairs. He undressed totally and she undressed partially; she then kissed him and rolled over and started to go to sleep. He was confused about what was going on, lit a cigarette and went over to the window to observe a lightning storm.

At that time he heard a cough from another part of the house. Mary pretended to cough in unison with the other cough, but was unable to do so. Next Gary sensed a shadow moving down the hall. He slipped on his bathing suit and went to investigate. He walked down the hall to the adjoining bedroom, flipped on the light switch, and was greeted by a white female holding a rifle. When he turned around he was confronted by defendant, who was brandishing a baseball bat. He motioned Gary to go back into the original bedroom where Mary was sitting on the side of the bed.

Defendant then proceeded to start hitting Gary with the baseball bat, but Gary was able to block the blows and eventually started swinging his fists at defendant, causing defendant to retreat. Just as he was getting the better of defendant, the female intruder shot Gary with the rifle, and he was then shot by the female a second time. Fearing for his life, he decided to play dead but he could not control his respiration. The intruders continued to beat him and he was finally able to lay still. Then he heard the female say to his wife, "Mary, I'm sorry, but he discovered us before we were ready."

Gary attempted to get up and reach the telephone, but defendant saw him and beat him some more. The female then shot him again. He once again played dead. The intruders then departed through the basement door, after which Gary crawled to the telephone and summoned the police. Shortly thereafter he received an outside phone call from his wife Mary inquiring how he was; he responded by cursing her.

Jerry Copeland was one of the St. Joseph policemen who about 11:30 p. m. responded to the call concerning this assault. As he arrived on the scene, he observed two suspects running, one of whom was carrying a rifle. He and his partner pursued them, but were only able to capture the female suspect, while the male suspect escaped. The female was later identified as Bonnie Ballard, defendant's wife. Later in the early hours of the following morning at approximately 2:15 a. m., defendant arrived at the police station and attempted to post bond for Bonnie. He was told that no bond had been set, and then he himself was arrested by Copeland.

Gary Huffman did not know the Ballards, and much less did he invite them inside his home. He testified that he kept no guns nor bats within the home. The whole affray occurred, according to Gary, approximately 15 to 20 minutes after his wife arrived home from her two hour absence. Gary further testified that at the time of the assault it crossed his mind, "that Mary had set this up." Gary did not see his wife again after the assault until November 28, 1975, when she was about to reenter the psychiatric ward at Methodist Hospital. She resumed hospitalization for a period from early December, 1975, until her Medicaid ran out and then she again entered the hospital in January, 1976, when she regained eligibility for Medicaid.

Defendant raises two points on appeal: 1) that the trial court erred in failing to acquit on the burglary charge, for the reason that the evidence was insufficient to prove that defendant broke into the Huffman house; and 2) that the court erred in excluding certain evidence respecting the voluntary nature of defendant's turning himself in to

the police. The second of these points lacks merit, but the first point is valid and requires reversal of the burglary conviction.

## I.

■ In burglary prosecutions, proof of an illegal entry is commonly made by showing that all windows and doors were secured at a time closely preceding the entry. When proof is made that all entrances have been locked prior to the entry and there is no evidence to support any subsequent legitimate reopening of any of the entrances, then there is no reasonable way in which the burglar can explain his presence in the building and an inference logically arises that he made his entrance in one of the illegal ways proscribed by the burglary statute. That form of proof was attempted by the State in this case by the testimony that all doors and windows had been securely closed in the early evening hours of the night in question.

■ However, the evidence here goes on to show that Mary Huffman left the home at about 8:00 p. m. and was gone until about 11:00 p. m. The prosecution offered no evidence at all concerning the condition of the back door after she returned to the house. So far as this record is concerned, that door at 11:00 p. m. could have been left wide open, available for free entry by anyone. Hence there is no predicate laid for the inference that defendant gained entry to the Huffman residence by breaking or other illegal means. *State v. Allen,* 344 Mo. 335, 126 S.W.2d 236 (1939).

If speculation were to be permitted, the most reasonable explanation of this bizarre episode would be that Mary Huffman let the Ballards into the house at the time of her return at 11:00 p. m. If that did happen, then permission by her as one of the persons having equal right to the premises would prevent defendant's entry from being burglarious. *Clarke v. The Commonwealth,* 25 Gratt. 908, 66 Va. 612 (1874). Even if the circumstances do not completely compel the conclusion that Mary Huffman permitted entry by the Ballards, that inference is at least a sufficiently reasonable one

to prevent conviction of defendant of burglary under the present evidence. The evidence of burglary against him is purely circumstantial, and under the well settled rule the circumstances shown "must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence." *State v. Franco,* 544 S.W.2d 533, 534 (Mo. banc 1977).

In any event, the burden was upon the State to prove that defendant gained entry to the Huffman home by use of a false key, by picking a lock or by breaking. This it failed to do.

## II.

■ Defendant called as his witness Mr. Wiley Gardner who testified that in the early morning hours of August 7, 1975, at between 12:30 and 1:00 a. m., he gave a ride to defendant who was then walking on the highway. During the course of that examination defense counsel asked Gardner: "Was Mr. Ballard aware at that time that the police were looking for him?" The prosecuting attorney objected to the question, and a lengthy colloquy then occurred out of the hearing of the jury. In response to the court's inquiry as to what it was that the defense was trying to prove by this testimony, defense counsel answered, "What I'm trying to prove is that Pete Ballard, upon learning that the police were looking for him, decided voluntarily to go down to the police station and turn himself in." He further indicated that he wanted to introduce this as a converse to the prosecution evidence that defendant had been running from the police. Thereupon after some further discussion at the bench, defense counsel proceeded with his examination of Gardner as follows:

"Q (by Mr. Scott) Now, after you had picked up Mr. Ballard, did he decide to go to the police station?

A He wanted to call first to see if they were looking for him.

Q O.K. Did he call?

A I called for him.

Q Did you relay the information you received to Mr. Ballard?

A  Yes.

Q  And then did Mr. Ballard decide to go to the police station?

A  Yes.

Q  How did Mr. Ballard get there?

A  I took him.

Q  Was there ever any doubt about Mr. Ballard going to the police station?

A  Well, not really."

It can be agreed that defendant is entitled to show that he voluntarily turned himself in and to let the jury know this in mitigation of the inference against defendant which the prosecution sought to draw from the fact of defendant's flight. Granting this to be so, the fact remains that defendant was permitted to place all of this in evidence before the jury. His complaint that the evidence was excluded stands rebutted by the record just quoted.

The judgment of conviction on Count II is affirmed. However, because of the insufficiency of the evidence concerning the burglary, the conviction on Count I is reversed. It is to be noted that the State did not call Mary Huffman as a witness for the prosecution and it is unknown what her testimony would be as to whether the back door to the Huffman residence was locked or at least closed upon her return home at 11:00 p. m. on August 6, 1975. Inasmuch as it is reasonably possible that the State may be able to show on a retrial this essential missing element of proof, this case will be remanded for a retrial on Count I if the prosecution desires to retry that charge. *State v. Wade*, 531 S.W.2d 726, 730 (Mo. banc 1976); *State v. Scurlock*, 541 S.W.2d 755, 759 (Mo.App.1976).

All concur.